**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

HERBERT WILLIAMS, JR.    )

     Petitioner,   )

vs.          )  CIVIL ACTION NO. 01-0777-CB-C

MICHAEL HALEY,     )

     Respondent.  )

## OPINION and ORDER

Petitioner Herbert Williams, Jr. has filed a petition pursuant to 28 U.S.C. § 2254 seeking habeas corpus relief from his state capital murder conviction and sentence.  In Stage I of these proceedings, the Court decided issues of procedural default and determined which claims would proceed to consideration on the merits.  Now, having considered the remaining claims on the merits, the Court concludes that the petitioner is not entitled to relief.

## FACTS

### The Murder

Timothy Hasser, a prominent young Mobile, Alabama businessman, was murdered on November 2, 1988.  On the day of his murder, Hasser had been alerted by his home security company that a burglar alarm had been tripped at his home, but he believed it to be a false alarm.  Hasser was last seen leaving his office at approximately 4:15 p.m.  Hasser's home security system was deactivated at 4:41 p.m.  Around 8:00 p.m. that evening, a police officer saw a white Porsche stopped on a bridge near Jackson, Alabama, approximately 80 miles north of Mobile.  The Porsche, which belonged to Timothy Hasser, was driven by the defendant, Herbert Williams.  When the officer stopped to assist, Williams said he was having car trouble.  The

officer followed Williams to a gas station and noticed that something was amiss.  Williams was

having trouble using the Porsche's manual transmission, and there was thick dark liquid dripping

from the rear hatch.  When they reached the gas station, the officer saw Hasser's body in the rear

hatch of the car.   He had been shot, and weights were tied to each of his ankles.

**Williams' Statements**

### First Statement

At the scene, Williams told police that he and his friend (the decedent) had been involved

in a drug deal in Demopolis, Alabama.  The people they were dealing with had taken his friend

away, shot him and brought him back with weights tied around his feet.  They told Williams that

he could live because he was black but that he had to take his friend and leave.  Williams

directed police to the gun that killed Hasser, a .38 caliber, under the front seat of the Porsche.

Six empty cartridges were found in Williams' pocket.

### Second Statement

Later that night at the police station Williams gave another, more detailed statement.  He

said that he and the victim, whom he identified as "Timothy Ross", went to an area south of

Demopolis on Highway 43 to buy crack cocaine.  They were late because Timothy was waiting

for his friend, a D.A., to come over to his house for a beer.  They arrived at the meeting place a

little after 6:00 p.m. and met three people–a Jamaican, a Haitian and a black male named Nep.

Nep reached into the victim's car, took out a brief case containing $3,000 that belonged to the

victim, and told the victim and Williams that they were being ripped off.  Initially, Williams said

that the victim was shot while running away.  Later, Williams said that both he and the victim

were forced to get out of the car and lie on the ground.  The victim was shot, but Williams was

spared because he was black.  Williams was instructed to get rid of the body, so he drove to his grandmother's house in Wagarville where he got some weights and tied them to the body.  He was going to throw the body off the bridge and into the river when the police officer stopped him.  After making this statement and answering some questions, Williams invoked his right to counsel, and the interview ceased.

**Third Statement**

On November 4, 1998, Agent Michael Barnett, an Alabama Bureau of Investigation (ABI) investigator assigned to the case, was at the Jackson Police Department.   Williams was being held there at the city jail, and Williams' parents were there to see him.  Barnett went into the coffee room and introduced himself to Mr. and Mrs. Williams.  They asked Barnett why their son was in jail.  Mr. Williams told Barnett his son's side of the story, *i.e.*, the drug deal gone bad, and Barnett said that might be true but there was also evidence pointing in another direction. Mr. Williams wanted to know if Barnett was going to talk to his son, and Barnett replied that he could not because Williams had requested an attorney.  Barnett told Mr. Williams that he could only talk to his son if Williams requested to have a police officer come and talk with him.  Mr. and Mrs. Williams went back and talked to their son, then came out and told Barnett that Williams wanted to speak with him.

Barnett met with Williams and again advised him of his rights, using a waiver of rights form.  Barnett advised Williams that he knew Williams had terminated the previous interview and requested counsel.  He explained that he could not speak to Williams without counsel unless Williams so requested.  Williams said he understood and, at Barnett's direction, wrote on the bottom of the form "I requested to talk to the police officer today, November the 4th, 1988.  They

advised me of my rights and I understand them." Williams then spoke with Barnett for seven hours, resulting in a 21-page written statement.

In this statement, Williams claimed to have known Hasser for two years. According to Williams, the two struck up a conversation as he was admiring Hasser's car, and Hasser asked him where he could obtain drugs. Williams began delivering packages for Hasser. Hasser paid him $500 or less for these deliveries but was putting some money in savings for him and also promised that after several deals he would give Williams his car, a Porsche 928, and $7,500. In October 1988, Hasser told him Williams to get a gun and come to Mobile on Halloween. Williams took a gun from his great-grandmother's house in Wagarville. Williams went to Mobile, but he was not supposed to go to Hasser's house because a black man visiting someone in Hasser's neighborhood would arouse suspicions. Eventually, on November 1, Hasser saw Williams walk by his house, and the two gestured toward the park. They met at the park, and Hasser told Williams that the deal was set for the next day in Mt. Vernon. Hasser told Williams to come to his house the next day and that he would leave a rear window open. If the car was not there, Williams was to ring the door bell because Hasser's girlfriend might be there. Hasser gave Williams the alarm code in case the alarm went off. The next day Williams went to the house and crawled in through a back window. He did not think the alarm went off, so he did not use the code. About 15 minutes later, the police showed up and looked in through the windows. Williams climbed up in the attic and chewed through a wire that he thought went to the alarm system. When Hasser got home, he was in a hurry to leave because his friends John and Claudia were coming over for a beer. Hasser left the television on and the front door open. The two drove in Hasser's car to Creola, north of Mobile, to a warehouse where the deal was to take

place.  While they were waiting, Hasser wrote out a bill of sale for the car: "I, Tim Rasses [sic] sell my 1980 928 Porche [sic] . . . to Herbert Williams for One Dollar."  (V. IV at 497.)   Hasser signed this bill of sale and handed it to Williams to sign.  At that time, someone tapped on the window and forced the two out of the car at gun point.  Two men took Hasser behind the building.  A third man stayed with Williams and forced him to get back in the car.  Williams heard gunshots.  The two men came back and took a package out of Hasser's car, punched Williams in the stomach and dropped a gun in the back of the car.   They talked about killing Williams but said it would not make any difference.  Williams shot at them as they left.  He then found Hasser and realized he had been shot but was still alive.  Williams got Hasser into the car and drove toward the hospital in Chatom.  Before he reached the hospital, Hasser died.  Williams panicked and decided he would throw the body off the bridge in Jackson.  He first went to his great-grandmother's house in Wagarville and got some weights to tie to the body and some socks to use as ties.   Then, he drove to Jackson to dispose of the body.  The policeman drove up while he was waiting to throw the body off the bridge, and he was caught.

**Fourth Statement**

Williams wrote yet another account of the murder while he was in jail.  Although this was not intended as a statement for the police, a fellow inmate, Golliday Miller, obtained it and gave it to investigators.  A handwriting expert confirmed that the document was written by Williams.  The statement was very similar to Williams' third statement except that the purpose of the meeting in Creola was a "trial" of someone who cheated "Nestor", a drug dealer with whom Hasser did business.  Hasser told Williams that he (Williams) was to kill the person on trial.  Hasser signed the Porsche over to Williams before the "trial" began.  Then, it turned out

5

that Hasser was the person on trial for cheating Nestor.  One of Nestor's men pointed an Uzi at

Williams and forced him to shoot Hasser.

## Other Incriminating Evidence

Police searched Williams' room in the home where he lived with his great-grandmother.

There they found weights similar to those tied around the victim's ankles and a book entitled

*New I.D.  in America*.  They also found a diary, which contained the following entries:

> Sunday, October 30, 1988. I will search this house for that gun. If I find it
> Monday, then I'm going to catch Larry to Prichard [sic]. I'll then walk to my
> destination. If the car is not there, well, I will break in from the back and wait.
> After doing the job, leave the place in my new car. Come back after I have gotten
> the gears right, load up and dump the body.
> . . .
> Monday, the 31st, 1982 [sic], Porsche 928, dump body, Tuesday, one, get as
> much money as I can, get car,' R-E-G, abbreviated, 'from Chatom, go Dixon
> Mills, hit Pine Hill.

In the Porsche, investigators found two crudely drafted documents purporting to convey

ownership of the Porsche from Hasser to Williams.  One was written on the back of an envelope

and the other on a bank deposit receipt.  Also, petitioner's fingerprints were found in Hasser's

house.

## Pretrial

Williams was indicted by a Mobile County Grand Jury and charged with capital murder.

Initially, attorneys Arthur Madden, a criminal defense attorney with experience in capital cases,

and Jay Kimbrough, a former assistant district attorney, were appointed to represent Williams.

In April 1989, Mr. Madden was permitted to withdraw due to a conflict of interest.  Attorney

James Lackey, a long-time criminal defense attorney also with experience in capital cases, was

appointed to replace Mr. Madden.  In September 1989, Mr. Lackey and Mr. Kimbrough moved

to withdraw due to defendant's refusal to cooperate with them.[1]  Judge Ferrill McRae, the circuit

judge assigned to the case, held a hearing and denied the motion to withdraw.  However, Judge

McRae appointed a third attorney, James Wilson, also an experienced criminal defense attorney,

to assist in representing the defendant.  Subsequently, Mr. Kimbrough was permitted to

withdraw due to his concurrent representation of a potential witness.  Defense counsel filed

numerous pretrial motions, including a motion for change of venue, a motion for youthful

offender treatment, discovery motions, motions to suppress evidence and statements, a motion to

authorize expert services,[2] and a motion to dismiss the indictment.

At a motions hearing on February 3, 1989, Judge McRae addressed the youthful offender

motion.  Judge McRae read into the record some findings from the report prepared by the

Alabama Department of Probation and Parole and held that "after reviewing all the information .

. . I see no way in the world that I can treat the Defendant as a Youthful Offender."  (R. Vol. II,

13.)  Williams' attorney requested clarification on the denial of youthful offender treatment.

Judge McRae stated that he "didn't deny it basically simply on what [the probation officer said

about Williams' drug use'][ ] [b]ut on the totality of the information contained within that report,

as well as my knowledge of the Alabama Law."  (R.Vol. II, 16.)  After explaining that he did

not go into the details of the report because the press was present in the courtroom, Judge McRae

asked defense counsel if there was "[a]nything else[.]" Mr. Kimbrough responded, "No sir." (*Id.*)

---

[1]In the motion, counsel alleged that the defendant had "totally failed or refused to
cooperate" or to discuss the case, the facts or any possible defenses, that he had been distrustful
and hostile, that he had demanded that his attorneys withdraw from the case and that he
demanded to be returned to his cell during a meeting with counsel.  (R. Vol. I, 56.)

[2]One of the expert services authorized was a psychiatric examination.  Defense counsel
hired Dr. Clyde Van Rosen, a psychiatrist, to conduct evaluate Williams prior to trial.

The prosecutor was ordered to provide open file discovery in this case.  Judge McRae addressed the defendant's discovery motion at a hearing on March 31, 1998.  After some initial discussion with defense counsel, the judge stated, "[The prosecutor]'s giving you an open file.  I don't know how you could ask for anything else."  (R. Vol. II, 23.)  Mr. Kimbrough responded with concerns that the prosecutor might not have information that would be contained in the investigator's file.  Judge McRae then ordered, "All right.  We'll make, we'll make this language.  That the District Attorney in open court said that his file is open to you to look at.  But if he comes into possession of any information at a later time that is not in his file at this time, he's to let you know of that."  (R. Vol. II, 23-24.)   Judge McRae reiterated the open file discovery order at a motions hearing on October 13, 1989.   Addressing a new discovery motion filed by defense counsel, the judge stated that the motion did not make a lot of sense to him "'because it's in the record already from the District Attorney that the file is–his file is open for [the defense] to read at any and all times.'"  (R. Vol. II, 75.)   The District Attorney's willingness to comply with that order is noted at least twice in the record.  At the October 13th hearing, Mr. Kimbrough testified that the District Attorney's file was available to him and that he had availed himself of it during his representation of the defendant.  (R. Vol. II, 97.)  In chambers on the day of jury selection, the District Attorney, Mr. Galanos stated for the record that he had told defense counsel that he would be in his office "all day Sunday [before jury selection] and you're entitled to anything in my files."  (R. Vol. III, 75.)  Mr. Lackey confirmed that this conversation had taken place.

**Jury Selection & Suppression Hearing**

Jury selection commenced on February 12, 1990.  During voir dire Judge McRae asked

potential jurors whether they would be unable to impose the death penalty under any

circumstances.  Four prospective jurors answered in the affirmative.  Defense counsel attempted

to rehabilitate them, but each remained adamant in their conviction that they could not vote to

impose the death penalty and the judge granted the prosecutor's challenges for cause.  (R. Vol.

II,  149-52, 158-59 & 165-66.)  Several members of the venire indicated that they had heard or

read pretrial publicity about the case.  Some of them recalled news reports that the victim's car

had been stolen.  Defense counsel interviewed each of these potential jurors on voir dire.  (R.

Vol. III,  211-12, 218, 246 & 253.)  Counsel interposed a challenge for cause to one of those

jurors, but it was denied.  (R. Vol. III, 211-12.)  Each of the jurors who heard news reports about

a stolen car indicated that he or she could set those reports aside and base a verdict solely on the

evidence presented at trial.  Once each side had exercised its peremptory strikes, the defense

made a *Batson* challenge because the prosecution struck either four out of seven or three out of

six African American jurors.[3]  The prosecutor proffered race-neutral reasons for each of his

strikes.  Judge McRae found that "the [prosecutor's] explanations [we]re valid" and denied the

*Batson* motion. (R. Vol. III,  276.)

Immediately prior to trial, Judge McRae held a hearing on Williams' suppression

motions.  At issue was the admissibility of all four statements, as well as the admissibility of the

evidence recovered from the car and the evidence recovered from the home.  Without need for

elaboration, Judge McRae ruled that the first two statements and the evidence were all

admissible.  The third and fourth statements were also found to be admissible, and the judge

---

[3]At the time the *Batson* challenge was made, there was some confusion among the court
and counsel about the number of African American jurors who had been on the panel.  (R. Vol.
III, 267-68.)

stated the reasons for his ruling.  He concluded that the third statement was instigated by the

defendant, not the ABI agent, and therefore did not run afoul of the Supreme Court's opinion in

*Edwards v. Arizona,* 451 US. 477 (1981).[4]  The fourth statement was deemed admissible, despite

the lack of testimony from the inmate who obtained it,[5] because there was expert testimony that

it was written in the defendant's own handwriting.

**Trial & Sentencing**

At trial the state's theory was that Williams had targeted Hasser, whom he did not know,

for his Porsche.  The prosecution introduced testimony about the events leading to the

defendant's arrest.  In addition, some of defendant's friends and acquaintances testified that prior

to the murder Williams, who was nineteen and unemployed, had told them he was getting a

Porsche. The prosecution also introduced the oddly drafted bill of sale found in the Porsche and

the diary found in defendant's room in which he detailed his plan to get the Porsche 928, do the

---

[4]In *Edwards*, the Supreme Court addressed the admissibility of a statement made in
response to police interrogation after defendant had invoked his right to counsel:

> We hold that when an accused has invoked his right to have
> counsel present during custodial interrogation, a valid waiver of
> that right cannot be established by showing only that he responded
> to further police-initiated custodial interrogation even if he has
> been advised of his rights. We further hold that an accused, such as
> Edwards, having expressed his desire to deal with the police only
> through counsel, is not subject to further interrogation by the
> authorities until counsel has been made available to him, unless the
> accused himself initiates further communication, exchanges, or
> conversations with the police.

*Id.* at 484-485.


[5]The inmate, Golliday Miller, suffered a complete lapse of memory when he took the
stand at the suppression hearing.

job, and dump the body.  Defendant's own statements–inconsistent, implausible explanations of the murder–were proffered as further evidence of guilt.  In addition, several witnesses were presented to refute Williams' claims that he and the victim knew each other, that they were involved in drug deals together and that the victim willingly left his house with Williams on the day of the murder.

Defendant's statements provided the theme for the defense.  The defense argued that it was a simple murder–no robbery involved–and, therefore, not a capital case.  The defense presented evidence to show that the defendant and the victim knew each other.  For example, some of the defendant's friends testified that he had talked about his friend "Tim" or "Timmy" or about his friend who had a Porsche.  Also, Williams had knowledge of personal details about the victim such as his alarm code and of the fact that he had a friend named John who was an Assistant District Attorney.  To bolster its theory that Hasser had prearranged a drug deal, the defense presented a witness who testified he saw Hasser traveling in a different area of town at the time the prosecution alleged he was being forced to drive to Creola.  Finally, the defense pointed to the bills of sale found in the car.  These documents, the defense claimed, took away the prosecution's motive theory.  Since the Porsche had been conveyed to Williams, it could not have been his reason for killing Hasser.  In sum, the theory of defense was that Hasser was murdered in a drug deal gone bad.

Closing arguments and jury instructions took place on the morning of February 16, 1990.  After a lunch recess, the jury returned a verdict finding Williams guilty of capital murder.

The sentencing phase began immediately thereafter.  The defense presented one witness–Arcola Williams, the defendant's mother.  Mrs. Williams testified that her son had lived

11

primarily with his paternal grandmother in Mobile, while she lived in Mt. Vernon, until he was

four because she worked and could not take care of him.  Once the defendant came to live with

her and his father, Herbert Williams, Sr., his father beat him regularly.  Mrs. Williams offered

the following testimony about the father's abuse:

Q      during the time that Herbert was home from the age of six up until the

        time he left to go to job corp, did his father beat him?

A      Oh, yeah he beat him many times.

Q      He beat him on a regular basis?

A      Yes.  Sometime seem like he whip em - - I know children have to be

        whipped sometimes.  Seem like he whipped his more than he should.

        More harsh to his.

Q      Would he beat him with his first [sic], as you beat a man - - a grown man?

A      After he got up some size, he did beat him from time to time with his fists.

Q      What age was that?

A      He had got to be a teenager then.

Q      Did he have occasion to take him to another room and beat him?

A      Yes. . . .

(R. Vol. VII, 120.)

Mrs. Williams went on to describe an incident where the defendant's father took him into

a bedroom and beat him.  After the beating, the defendant went to a neighbor's house and called

the police because his father had "choked him and did [sic] everything to him while he was in

there."  (R. Vol. VII, 121.)  Mrs. Williams also testified that her husband "was drinking and

12

get[ting] drunk pretty regular [sic]" when the defendant was growing up.  The abuse was not

limited to his children.  According to Mrs. Williams, Herbert Williams, Sr. also beat her.  The

unflattering portrait of the defendant's father, was completed by Mrs. Williams' testimony that

Herbert Williams, Sr. was presently in jail for molesting and raping the couple's 14-year-old

mentally retarded daughter.

The defense argued against the death penalty based on two mitigating factors–the

defendant's lack of any significant criminal history and the defendant's history of childhood

abuse and neglect.  The sole aggravating factor for the jury's consideration was that the murder

was committed during the course of a robbery.  On the afternoon of February 16, 1990, the jury

returned its sentence–life in prison without parole.

Alabama sentencing law in effect at that time permitted a sentencing judge to override a

jury's sentencing decision in a capital case.  At sentencing on April 11, 1990, Judge McRae

overrode the jury's sentence and imposed the death penalty, giving the following reasons for his

decision:

> [T]he capital offense was committed while the Defendant was engaged in
> the commission of a robbery.  Therefore, the Title 13A-5-49(4) aggravating factor
> [murder during the commission of a felony] does exist and is considered.
>     The evidence, as stated previously, proved beyond a reasonable doubt,
> that the Defendant was consumed with the notion of owning a Porsche and that
> that obsession was the sole motivation for the robbery/murder of Timothy Hasser.
>     The Court further attaches great significance to the calculated precision
> with which this crime was planned and systematically executed.  The Defendant's
> diary manifests a greed and depravity of mind characteristic of an individual who
> has an utter disregard for human life and the rights and property of others.

(R. Vol. V, 190.)

Judge McRae found three mitigating factors–two statutory and one non-statutory.  The

two statutory factors were lack of criminal history and youth.  While the judge made no specific

13

comment about his consideration of the lack of criminal history, he found that "[t]he reptilian

coldness with which this criminal act was devised and perpetrated vitiates any contention that

the innocence of youth was a factor in the murder of Timothy Hasser." (R. Vol. V, 192.)  The

sole non-statutory mitigating factor was "that the Defendant's father was violent and abusive

towards him as a child." (*Id.*)  The judge found, however, that his fact "makes the Defendant no

less accountable for his action. . . ." and also "considered that the Defendant's mother and

grandmother testified in his behalf.  Both appeared to be decent people who genuinely cared for

the Defendant.  It, therefore, would strain credulity to find that the Defendant's background was

one of total deprivation." (*Id.*)

## Direct Appeal

Attorney Al Pennington was initially appointed to represent the petitioner on appeal,[6]

Pennington filed a rather perfunctory brief, raising only four issues in his brief to the Alabama

Court of Criminal Appeals.  The appellate court affirmed the conviction by written opinion

issued September 20, 1991.  No application for rehearing was filed by Mr. Pennington.  On

October 29, 1991, the Court of Criminal Appeals granted rehearing *ex mero motu* and remanded

the case to the trial court for removal of counsel and appointment of new counsel.  The trial court

appointed attorney Gregory Hughes to replace Mr. Pennington.  Mr. Hughes filed a brief in

support of rehearing, raising several new issues. The Court of Criminal Appeals allowed

additional briefing on these issues.  On March 27, 1992, the court extended its opinion and

overruled the application for rehearing.  *Williams v. Alabama*, 627 So. 2d 994 (Ala. Crim. App.

1992).  In the extended opinion, the court expressly addressed and rejected each of the claims

---

[6]Mr. Lackey and Mr. Wilson were permitted to withdraw after sentencing.

14

raised in the petition for rehearing.

Mr. Hughes filed a petition for writ of certiorari on petitioner's behalf in the Alabama Supreme Court. The petition raised eleven issues and numerous sub-issues. The supreme court granted certiorari, and subsequently entered a written opinion affirming petitioner's conviction. In its opinion, the court specifically addressed some issues and as to the remaining issues "conclude[d] that the Court of Criminal Appeals correctly answered them." *Ex Parte Williams*, 627 So. 2d 999, 1005 (Ala. 1993). The court further stated: "[W]e have searched the record for plain error . . ., and we have found none." *Id.* Finally, as required by Ala. Code § 13A-5-53(b)(1), the court considered and weighed the aggravating and mitigating factors and found that the death sentence was "proper and not disproportionate to the crime." *Id.* An application for rehearing was overruled. Judgment was entered on September 14, 1993. Williams next filed a petition for writ of certiorari in the United States Supreme Court. That petition was denied. *Williams v. Alabama*, 511 U.S. 1012 (1994) (mem.).

## Rule 32 Proceedings

On October 17, 1994, petitioner filed a collateral attack on his conviction and sentence in the Circuit Court of Mobile County pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. He was represented in those proceedings by attorneys Gilda Williams, Ellen Wiesner and LaJuana Davis. An amended petition was filed on July 24, 1995, and a second amended petition was filed on January 16, 1997. Judge McRae held an evidentiary hearing on June 19 and 20, 1997; the hearing was recessed and reconvened on July 22, 1997 for additional testimony.

Although Williams raised numerous claims in his Rule 32 petition, the evidentiary

hearing focused on three issues.  First, during Rule 32 discovery Williams' counsel had found

documents in the prosecutor's file that had not been in the possession of trial counsel.  Those

documents consisted of three notes.  The first two related to a sighting of a sports car similar to

the victim's car in mid-afternoon on the day of the murder.  Williams' Rule 32 counsel

contended that this information was material to the defense because it strengthened the defense's

drug deal theory.  With this evidence, they could have argued that Hasser had been to Creola

earlier on the day of the murder to scope out the site for the drug deal or meeting.  One of these

notes was found in the prosecutor's file and one was found in the investigator's file.  Both

indicated that a witness, Ken Nixon, had called the police and told them he had seen the car at

the Creola Truck Repair around 3:30 p.m. on the day of the murder.  Ken Nixon testified at the

Rule 32 hearing, but his testimony was less helpful than the notes would suggest.  He testified

that he saw a light-colored sports car parked in front of an unoccupied building in Axis,

Alabama.[7]  He may have told police that it was a Porsche, but at the time he thought it was a

Mazda.  The state countered the alleged sighting of the victim's car in Creola with the testimony

of the victim's sister-in-law, Carolyn Hasser, who testified that Timothy Hasser came by her

house in Mobile around 3:00 p.m. to pick up her children.  He took them to a department store,

returned them home about 3:40 p.m. and left about ten minutes later.  The third note contained

information related to petitioner's claim that he and the victim were friends.  The District

Attorney had written that "Palmer Williams . . . advises that Jerry Parker may have seen" the

defendant and the victim at the corner of Government Street and another street.  No evidence

was presented to establish who Palmer Williams or Jerry Parker were, when this sighting

---

[7]Axis is on Highway 43 near Creola.

occurred or any other facts or circumstances related to this note.

The second focus of the Rule 32 hearing was the statement Williams gave to Agent Barnett on November 4, 1998 at Jackson police station--specifically whether police initiated contact after Williams invoked his right to counsel.  Williams mother, Arcola Williams, testified that when she and her husband went to the police station to see their son, they were taken aside by two officers, one of whom may have been an ABI agent.  According to Mrs. Williams, the officers told them that their son was going to be in a lot of trouble, that a lawyer could cost $25,000 or more but that they could help their son if Mr. and Mrs. Williams could get him to talk to them.  Mrs. Williams encouraged her son to talk to the police, but he never said whether or not he would talk to them.  She and her husband came out and told police what her son had said about what happened.  After that, Mrs. Williams testified, the police went in and talked to her son, then came out and spoke again with her and Mr. Williams.  At that point, according to Mrs. Williams, she and her husband left the police station.

The third area of testimony and evidence related to trial counsel's alleged failure to investigate and present mitigation evidence at the sentencing phase.  Three family members testified about the abuse Williams and his siblings suffered at the hands of their father. Williams' half-sister, Queenie Mae Peoples, provided a detailed picture of horrific abuse perpetrated by Herbert Williams, Sr. against all members of their family over a long period of time during petitioner's childhood.  Not only did Arcola Williams fail to protect her children from her husband's abuse, she also abused them herself.  Mrs. Peoples also testified regarding

the family history of incest.[8]  Williams' paternal aunt, Deborah Perine, testified about Williams'

early childhood–that he lived with his grandmother in Mobile while his mother lived and worked

in Mt. Vernon and basically looked to his aunt as a mother figure during his early years.

Williams' paternal uncle, Curtis Williams, testified primarily about Arcola Williams' role in the

family and the lack of any family structure in the Williams household.  Unable to protect her

children or herself from her husband's abuse, Arcola Williams seemed to distance herself from

them, according to Curtis Williams. Mrs. Williams was not home much–most of her time outside

work was spent at church services or doing volunteer work for the church.

Rule 32 counsel called an expert witness, Dr. Eliot Gelwan, a psychiatrist specializing in

psychopathology and differential diagnosis, to testify regarding mitigation.   Dr. Gelwan

conducted an extensive investigation of Williams' background.  He reviewed Williams' medical,

school and employment records, along with the psychological testing and evaluation prepared by

state and defense experts prior to trial.  He conducted 40 to 60 hours of interviews with a number

of people who knew Williams throughout his life.  Dr. Gelwan also interviewed Williams and

administered some psychological tests to him.  As a result of his evaluation, Dr. Gelwan

concluded that Williams suffered from Post-Traumatic Stress Disorder (PTSD).   Dr. Gelwan

arrived at that opinion based on four criteria: (1) Williams' early traumatic experiences–the

brutality and terror of abuse suffered by Williams from early childhood; (2) Williams' reports of

"intrusive memories"--recurrent images of the trauma of childhood abuse and (3) symptoms of

"numbing and avoidance"–avoiding places or situations that would trigger memories of abuse,

---

[8]Mrs. Peoples was the product of her maternal grandfather's rape of his own daughter,
Arcola Williams.

amnesia about difficult events, withdrawal, detachment, and a restricted affect and an inability to love; and (4) persistent symptoms of increased arousal–sleep difficulties, angry outbursts, decreased concentration and hyper-vigilance.  Dr. Gelwan testified that, in his opinion, someone with severe PTSD, such as Williams, could have a substantially diminished capacity to conform his conduct to the requirements of the law.   On cross examination, Dr. Gelwan testified that it was his assessment that Williams had been truthful with him and that he "by and large" believed what Williams had told him.  When asked whether there were any good aspects of the Williams family, Dr. Gelwan stated that Arcola Williams may have been well-intentioned and that Williams had a supportive and caring extended family.

In rebuttal to this evidence, the state offered two types of testimony.  First, one of defendant's defense attorneys, James Lackey,  testified that the defendant had been evaluated by a psychiatrist, Dr. Van Rosen, prior to trial but that he did not use Dr. Van Rosen at sentencing because his testimony would not have been helpful.  Second, the state called its own expert witness, Dr. Karl Kirkland, a psychologist, who disputed Dr. Gelwan's PTSD diagnosis.

On January 27, 1999, Judge McRae entered a written order denying the Rule 32 petition. With respect to the *Brady* claim, the judge held that the notes did not meet any of the three essential *Brady* elements. First, the notes were not suppressed because the court had ordered open file discovery and the defense counsel had not filed a motion alleging a lack of access to the file.  Second, the notes were not exculpatory.  The Palmer Williams note contained double or triple hearsay.  The Nixon notes and testimony did not establish that the sports car Nixon saw belonged to the victim, and any inference to that effect that might be drawn McRae found to be refuted by Carolyn Hasser's testimony that Timothy Hasser was in Mobile at the time Nixon saw

the sports car in Creola.  Finally, none of the evidence was found to be material; that is, there was no reasonable probability that the result of the proceedings would not have been different if the evidence had been disclosed.

The evidence regarding petitioner's third statement had been offered to support the claim that trial counsel was ineffective for failing to present Mrs. Williams testimony at the suppression hearing.  Judge McRae rejected this claim because counsel's performance was neither unreasonable nor prejudicial.  He found Mrs. Williams' underlying testimony to be implausible because (1) it conflicted with Agent Barnett's testimony about how the encounter at the police station took place and (2) police already had two statements from Williams.

Judge McRae also rejected petitioner's claim that trial counsel had been constitutionally ineffective for failing to discover and present the mitigation evidence presented at the Rule 32 hearing.  The judge noted that there is always more evidence that, in hindsight, could have been presented.  He further found that the mitigation evidence had little value because the crime was deliberately planned.  As to defense counsel's failure to present expert testimony at the penalty phase, Judge McRae pointed out that Williams had been evaluated by a defense psychiatrist prior to trial but that evaluation did not yield any evidence that would have been helpful at the mitigation stage.  In addition, Judge McRae did not find Dr. Gelwan's diagnosis to be credible in light of the findings of other mental health professionals who had examined Williams.  Finally, Judge McRae rejected the mitigation/ineffective assistance argument because Williams failed to prove that Dr. Gelwan would have been available to testify at his trial in 1990.

Judge McRae's order was affirmed by the Alabama Court of Criminal Appeals by published opinion, which adopted large portions of Judge McRae's order.  *Williams v. Alabama*,

782 So. 2d 811 (Ala. Crim. App. 2000).  Petitioner filed a petition for writ of certiorari in the

Alabama Supreme Court, which was denied on November 9, 2000.

## SECTION 2254 PROCEDURAL HISTORY

Williams filed the instant 2254 petition on November 8, 2001 and amended it on July 31,

2002.  In the amended petition, petitioner raised the following claims:

A.  The State withheld exculpatory evidence in violation of *Brady v. Maryland.*
B.  The prosecutor utilized peremptory challenges in racially discriminatory
manner in violation of *Batson v. Kentucky*.
C.  Trial Counsel Rendered Constitutionally Ineffective Assistance of Counsel
    a.  By failing to present evidence at the motion to suppress;
    b.  By failing to effectively voir dire jurors opposed to the death
    penalty;
    c.  By failing to challenge for cause jurors, on the basis of bias,
    jurors who believed that petitioner had stolen the victim's car;
    d.  By failing to object to the prosecutor's improper comments in
    closing arguments during the guilty phase;
    e.  By failing to object to improper jury instructions during the
    guilty phase;
    f.  By failing to present evidence at the sentencing phase to
    counter the judge's finding that the petitioner's life was not one of
    total deprivation;
    g.  By failing to investigate petitioner's background, which would
    have yielded mitigation evidence to present at the sentencing
    phase;
    h.  By failing to retain a mitigation expert to testify at the
    sentencing phase.
D.  The State withheld evidence regarding the circumstances of the statement
petitioner gave to ABI Agent Barnett.
E.  Alabama sentencing scheme allowing judicial override is unconstitutional in
light of *Ring v. Arizona*.
F.  The trial court's denial of youthful offender status violated petitioner's
constitutional rights under the Eighth and Fourteenth Amendments.
G.  The trial court's limits on and interference with voir dire violated petitioner's
constitutional rights.
H. The trial court refused to allow probing voir dire of jurors who expressed some
opposition to the death penalty in violation of *Witherspoon v. Illinois*.
I.  The trial court failed to excuse for cause biased jurors.
J.  The trial court violated petitioner's constitutional rights by requiring him to
give hair samples.

K.  The manner of execution used by the state of Alabama amounts to cruel and unusual punishment.

The proceedings in this matter were divided into two stages.  At Stage I, the parties submitted briefs on issues of procedural default and the need for an evidentiary hearing.  In its Stage I order, this Court held that no evidentiary hearing was required or necessary and that the majority of claims were either procedurally defaulted or moot.  At Stage II, Claims A, B, C, D, and F[9] have proceeded to review on the merits, and the parties have fully briefed their positions as to the merits of each of those claims.  For the reasons discussed below, the Court finds that petitioner is not entitled to relief on any of the remaining claims.

**LEGAL ANALYSIS**

**<u>Standard of Review</u>**

The standard a federal court must apply when reviewing a state habeas petition is quite deferential.  A state court's decision may be overruled on legal grounds only if the decision was "contrary to. . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," *id.*  A state court decision is "contrary to" clearly established law if "the state applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor,* 629 U.S. 362, 405-06 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant

---

[9]As discussed in the Stage I order, certain portions of Claims B and C were found to be procedurally defaulted.

the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Clearly established federal law is found "in the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. Lower court decisions–even those of the federal courts of appeal–do not clearly establish law for purposes of 28 U.S.C. § 2254(d)(1). *Id.* at 381

A habeas petition may be granted on factual grounds only if the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). The state court's factual determinations are to be presumed correct, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." While these standards appear to "express the same fundamental principle of deference to state court findings," some courts of appeal have concluded that the two sections were intended to apply to different inquiries. The "overarching standard" is that set forth in § 2254–if the state court's factual determination was reasonable in light of the evidence before it, then it must be upheld. *Lambert v. Blackwell*, 387 F.3d 210 (3rd Cir. 2004). Section 2254(e)(1) comes into play only when the state court's factual determinations are attacked by extrinsic evidence, *i.e.*, at a hearing in federal court. In that case, a federal court may overturn the state court's individual factual determinations if persuaded by clear and convincing evidence, but "[i]n the final analysis, [ ] even if a state court's individual factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2)." *Lambert v. Blackwell*, 387 F.3d 210, 235 -236 (3rd Cir. 2004); *accord*

*Taylor v. Maddox*, 236 F.2d 992, 999-1000 (9th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 951 n. 17 (5th Cir. 2001).

## Claim A:  Brady Violation/Prosecutor's Notes

Petitioner asserts that the prosecutor failed to disclose exculpatory evidence to the defense in violation of his constitutional right to due process as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).  This claim focuses on three notes found in the prosecutor's file during Rule 32 discovery ("the prosecutor's notes").  These notes were proffered at the Rule 32 hearing to support petitioner's defense that the victim and the petitioner were friends and that the victim was killed by a drug dealer when a deal they were involved in together went bad.[10]  The state court concluded that the notes did not satisfy the elements of a constitutional due process violation under *Brady*.  That decision was neither contrary to nor an unreasonable application of clearly established law.  Furthermore, the factual determinations upon which the state court's decision was based were not unreasonable in light of the evidence presented at the Rule 32 hearing.

### The Components of a Brady Claim

---

[10]Two of the three handwritten notes found in the prosecutor's file related information regarding a car John Nixon had purportedly seen at an abandoned business in Creola on the day of the murder ("the Nixon notes").  Petitioner argued that the information contained in these notes supported his defense by providing proof that the victim had been at the site of the murder and alleged drug deal earlier on the day of the murder.  The third note related to a different event, an alleged sighting of the defendant and the victim together in Mobile at an unspecified time by someone named Jerry Parker ("the Parker note").  According to the note, the information that Parker had seen the two together came from a third person–Palmer Williams.  Petitioner argued that this information provided support for his claim that he and the victim knew each other prior to the murder, thus lending credibility to the petitioner's defense that he and the victim were involved in a drug deal together.

In *Brady* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  A *Brady* claim has three components: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" <u>and</u> (3) "prejudice must have ensued...." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

**State Court Resolution**

The Alabama Court of Criminal Appeals ruled against petitioner on all three prongs of the *Brady* claims as to each of the prosecutor's notes.  The appellate court adopted the circuit court's finding that the notes were not suppressed because "[t]he record of the trial transcript shows that neither trial counsel filed a motion indicating that the prosecutor was in violation of [the circuit] court's order" requiring the prosecutor to maintain an open file. *Williams v. State*, 782 So. 2d 811, 819 (Ala. Crim. App. 2000).  The court further concluded that the notes were not exculpatory and that the defense was not prejudiced by the lack of disclosure.  The Parker note was deemed not to be exculpatory because it only stated that the victim and the defendant *may* have been seen together, the origin of the information contained in the note was unknown, the note possibly contained triple or quadruple hearsay, and Williams failed to "present any admissible evidence to show that the information contained in this note could have been presented to the jury in some way." *Id*. at 820.  The Nixon notes were found not to be exculpatory because the evidence derived from those notes–John Nixon's testimony at the Rule 32 hearing–was not helpful to the defense.  Nothing in these notes or in Nixon's testimony [ ]

establishes that the white sports car he saw on November 2, 1988 was owned by Timothy.

During his testimony at the Rule 32 evidentiary hearing, Nixon was not sure if the make of the

car he saw that day was a Porsche."  *Id.*  Further, the court found that "nothing in the[ ] notes or

in Nixon's testimony [ ] links this information with the victim or Williams."  Finally, the court

credited the testimony of Carolyn Hasser, the victim's sister-in-law, which placed the victim and

his car in Mobile at the time Nixon saw the sports car in Creola.  The court concluded that the

petitioner had failed to establish that any of the notes were material.  The only reason given for

this conclusion was that the Parker note was inadmissible and could not have been submitted to

the jury.

**Discussion**

Petitioner argues that the state court's decision regarding his *Brady* claims was an

unreasonable application of the law with respect to the suppression prong and both contrary to

and an unreasonable application of clearly established law with respect to the remaining prongs

of the *Brady* analysis.  The state court's decision is due to be upheld as to both the suppression

and prejudice prongs of the *Brady* analysis.[11]

Citing *Banks v. Dretke*, 540 U.S. (2004) and *Strickler v. Greene*, 527 U.S. 263 (1999),

petitioner points out that a prosecutor's failure to include exculpatory materials in an "open file"

amounts to suppression.  According to petitioner, the state court erroneously and unreasonably

found that no suppression had occurred because defense counsel had neglected their duty to

---

[11]Because all three elements must be satisfied in order for a defendant to prevail on a *Brady* claim, this Court need not address the state court's conclusion that the evidence was not exculpatory.

object to the prosecutor's failure to disclose documents.  Petitioner points out that the Supreme

Court in  *Banks* and *Strickler* has made clear that omission of exculpatory evidence, standing

alone, amounts to suppression under *Brady* when discovery is "open file".   But petitioner's

argument misconstrues the facts found and addressed by the state court in this case.  The court

held:

> Both trial counsel [who] testified at the Rule 32 evidentiary hearing stated that
> they had not seen these handwritten notes.  However, one of the trial counsel
> acknowledged that this court had ordered an open file discovery policy.  Trial
> counsel added that he was 'not allowed to go to Mr. Galanos' office and go
> through his file.' . . . The record of the trial transcript shows that neither trial
> counsel filed a motion indicating that the prosecutor was in violation of this
> court's order,. . . which ordered the prosecutor to have an open file.  Therefore,
> Williams has not established by a preponderance of the evidence that these
> handwritten notes were suppressed.

*Williams*, 782 So. 2d at 819.

Thus, the state court found that  petitioner's *proof* on the suppression issue was lacking.

Since counsel had not filed a motion protesting the state's failure to comply with open file

discovery, the court did not believe petitioner's claim that the entire file was not available to the

defense.[12]  No evidence was presented that the notes could not have been found if the file had

been examined by defense counsel.[13]  That makes this case significantly different from *Strickler*

---

[12]The record from pretrial and trial proceedings supports this conclusion.  During a
pretrial hearing, defense counsel Jay Kimbrough acknowledged that the D.A.'s file had been
made available to him and that he had availed himself of it.  (V2-91.)  More specifically, during
jury selection, District Attorney Galanos stated to the court that he had informed defense counsel
that "I'll be in my office all day Sunday [prior to commencement of jury selection] and you're
entitled to anything in my files."  (V. 3-275.)  In response, defense attorney Wilson stated that he
was not aware of this, but co-counsel Lackey stated, "I was, Judge."  (*Id.*)

[13]Defense counsel did not recall seeing the statements before the Rule 32 proceedings,
but they appeared to have relied on the prosecutor to provide them with copies of the file.  There

and *Banks* where the defendants' attorneys were given access to a file–represented to be the complete file--from which exculpatory information had been withheld or removed.  Here, there is no evidence that defense counsel ever looked at the District Attorney's file themselves, even though they had access to it.  Thus, there is no proof as to what was, or was not, in the District Attorney's file–which was available to the defense--and no evidence that the notes were suppressed.  The state court's conclusion on the suppression prong was not contrary to or an unreasonable application of *Strickler* or *Banks*.

Petitioner fares no better with his argument that the state court unreasonably applied *Brady's* prejudice prong.  A defendant suffers prejudice when exculpatory information is withheld if the evidence is "material either to guilt or punishment."  *Brady*, 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.*  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 681 (1985).   The state court found that the notes were not material because petitioner failed to establish that any of the notes would have been admissible or would have led to admissible evidence.[14]  Petitioner argues that this conclusion

---

is no evidence that the District Attorney represented these copies to be the complete file.

[14]Both the Nixon notes and the Parker note were hearsay and, therefore, inadmissible. Nixon himself testified at the Rule 32 hearing, and his testimony was different from the note.  At the hearing, Nixon testified that on the day of the murder he saw a light colored sports car parked in front of a metal building, an unoccupied business, on Highway 43 in Axis, Alabama.  (V. XIII at 83.)  While he may have told the Creola Police Department that the vehicle was a Porsche, he thought it was a Mazda at the time.  (*Id.* at 89.)  Interestingly, petitioner argues that the Nixon notes were material, but he is silent as to the materiality of Nixon's actual testimony.  He does not argue that the state court was unreasonable in its conclusion that Nixon's testimony was neither exculpatory or material.

was an unreasonable application of the law because "nothing in *Brady* requires evidence to be admissible to be considered material for *Brady* purposes."  (Pet.'s Merits Brf, Doc. 45, at 55.) While that may be true, it is also true that neither *Brady* nor *Bagley* compel, or even suggest, the opposite conclusion, *i.e.*, that admissibility has no effect on materiality.  Because materiality is defined in terms of the probable affect on the proceedings, it is not unreasonable to conclude that only admissible, or potentially admissible, evidence is material.  In fact, as petitioner acknowledges, the Eleventh Circuit has adopted a definition of materiality identical to the one applied by the state court. *See  Spaziano v. Singletary*, 36 F.3d 1028, 1044 (11th Cir. 1994) ( "A reasonable probability of a different result is possible only if the suppressed information is itself admissible evidence or would have led to admissible evidence. Otherwise, the suppression of the information could not have affected the basis of the verdict, which is the evidence the factfinder heard.") The state court's finding that petitioner suffered no prejudice from the alleged *Brady* violations was not unreasonable.

## Claim B:  Batson Claims

Review of the state court's ruling on petitioner's *Batson* claims is made more challenging because the issues raised in petitioner's merits brief are not the issues that were raised in state court and preserved for habeas review.  To understand the difference between the claims argued here and the claims  actually raised and decided in state court, it is first necessary to review the requirements of *Batson*.

### Batson v. Kentucky

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the use of peremptory challenges to exclude potential jurors on the basis of race violates the Equal

Protection Clause of the United States Constitution.  The burden is on a defendant to prove that the prosecutor engaged in purposeful discrimination.  *Id.* at 96.  A challenge to the jury made pursuant to *Batson* has three distinct steps.  First, the defendant must establish a prima facie case of discrimination.  *Id.* at 97.  If the defendant makes the requisite showing, then the burden shifts to the prosecution to come forward with a race-neutral explanation for its peremptory challenges. *Id.*  At this point, the prosecutor's proffered reasons "need not be 'persuasive or even plausible...the issue is the facial validity of the prosecutor's explanations.'"  *McNair v. Campbell*, 416 F.3d 1291, 1310 (11th Cir. 2005 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (internal quotation omitted)).  Once both parties have satisfied their initial burdens, then "the trial court has the duty to determine if the defendant has established purposeful discrimination."  *Batson,* at 98.  At this stage of the inquiry, "'the decisive question will be whether counsel's race-neutral explanation . . . should be believed.'"  *McNair*, at 1310 (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality opinion)).

### The State Court Ruling

In its order on direct appeal affirming the petitioner's conviction, the Alabama Supreme Court entered the following ruling regarding petitioner's *Batson* challenge:

> Williams also argues that the state violated *Batson v. Kentucky* . . . in using peremptory strikes to remove four blacks from the jury venire.  The reasons proffered by the State for those four strikes were that an arrest warrant was pending with regard to one of those veniremembers; that one of them knew a defense witness; that one had been arrested for harassment; and that the other admitted to [f]ighting, cutting,  saying, 'I've been cut.  I've got cut and I've cut people."  In justifying his strike of the latter veniremember, the district attorney stated that the veniremember's statement indicated illegal activity.
>
> A connection with or a founded suspicion of criminal activity can constitute a sufficiently race neutral reason for the exercise of a peremptory strike.  . . .  We have considered the prosecutor's reasons for striking the four

blacks on the jury venire, and we find all the reasons to be race-neutral.

*Williams*, 627 So. 2d at 1004-05 (internal quotations and citations omitted).

### Identifying Petitioner's *Batson* Claims

Petitioner's *Batson* claim or claims have been somewhat amorphous.  While the claim

raised in the amended habeas petition is stated broadly enough to encompass all three steps of

*Batson* review, the *Batson* issue raised by petitioner before the Alabama Supreme Court and

addressed by that court on direct review was much narrower.  In his amended habeas petition,

petitioner asserts, generally, that "the prosecutor utilized his peremptory challenges in a racially

discriminatory manner."  (Am. Pet. at 39.)  Petitioner alleges facts to support a prima facie case

(the first *Batson* step) and also asserts that the reasons offered by the prosecutor either were not

facially neutral (the second *Batson* step) or "are either contrary to or unsupported by the record"

(the third *Batson* step). (*Id.* at 40.)  In his appeal to the Alabama Supreme Court, petitioner

challenged the trial court's ruling only as to the second *Batson* step, that is, whether "[t]he trial

court['s] finding that the prosecution's proffered reasons for its peremptory strikes of African

American jurors were race neutral."  (R. Vol. X, 104.)  That question–whether reasons were

race-neutral–is the question that the Alabama Supreme Court answered in its opinion.

In his merits brief, petitioner has given the *Batson* claim a different twist.  After

demonstrating how he has satisfied *Batson's* first step–the prima facie case

requirement–petitioner argues that the lack of a record of portions of the jury selection process

makes a full *Batson* analysis impossible.  Specifically, petitioner contends that missing record

prevents him from determining whether the prosecutor's proffered race-neutral reasons also

applied to whites who were seated as members of the jury, *i.e.*, the third *Batson* step.  Petitioner

argues that his conviction is due to be reversed because he has been prejudiced by the lack of a

record.

Much of petitioner's *Batson* challenge is precluded by the doctrines of exhaustion and

procedural default.  First, petitioner's claim that the incomplete transcript entitles him to relief

for violation of due process is not a *Batson* claim and has never before been raised.  In fact, in

his Stage I brief before this Court, petitioner affirmatively argued that references to the missing

transcripts were not intended to state a separate claim.[15]  Because petitioner never raised this

claim in state court, he has failed to satisfy the exhaustion requirement.  *Snowden v. Singletary*,

135 F.3d 732, 735 (1998) *(*state prisoner must first present federal claims to the state courts so

that state has opportunity to correct alleged federal constitutional violations).  When the federal

court determines that exhaustion would be futile, then an unexhausted claim need not be returned

to state court.  *Id.* at 736.  Here exhaustion would be futile because Alabama procedural default

rules preclude consideration of a claim that was not raised on direct appeal. Ala. R. Crim. P.

32.2(a)(5).  To the extent that petitioner has raised a challenge based on the third step of the

*Batson* analysis, that claim likewise due to be denied on exhaustion and procedural default

grounds.  Petitioner's sole state court *Batson* claim was directed at the second *Batson*

step–whether the prosecutor's reasons were race neutral.

---

[15]Specifically, petitioner stated: "[t]he footnote [pointing out the missing trial transcript] in no way pleads a new claim or introduces new evidence; it simply points out an omission in the trial transcript and explains the use of alternative sources of information concerning the prosecution's use of peremptory strikes, while noting the standard or review applicable when the state record is incomplete."  (Petr.'s Stage I Brf, Doc. 28, at 20.)  Based on that assertion, this Court initially found the state's exhaustion/procedural default defense on this issue to be moot. The defense is no longer moot.

In his merits brief, petitioner has not addressed the only *Batson* claim that has been preserved for federal habeas review, *i.e.*, that the trial court erred at step two of the *Batson* analysis. In any event, he is not entitled to relief on that claim. "Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered [at step two] will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768  (1995) (per curiam) (quoting *Hernandez*, 500 U.S. at 360).  The prosecutor's reasons for striking the four African-American jurors were: (1) one juror had a pending arrest warrant; (2) one juror knew a defense witness; (3) one juror had been arrested for a misdemeanor and (4) one juror admitted to criminal activity.  The trial court's factual determination that these reasons were race-neutral was not objectively unreasonable, nor was the court's legal analysis contrary to or an unreasonable application of clearly established Supreme Court law.[16]

## Claim C:  Ineffective Assistance of Counsel

The amended petition sets out eight claims based on Sixth Amendment violations arising from ineffective assistance of counsel.  In addition, petitioner's merits brief asserts an additional ineffective assistance claim not raised in the amended petition.  The claims are based on various purported errors of counsel from the pretrial stage through appeal.  Before addressing each of those claims below, the Court sets out the legal framework for evaluating a post-conviction ineffective assistance of counsel claim.

### The Controlling Legal Principles--Strickland v. Washington and its Progeny

---

[16]The Court has addressed this claim out of an abundance of caution, even though petitioner has not pursued it in his merits brief.  Since the claim has not been briefed, petitioner has not specified whether the claim arises under 28 U.S.C. § 2254(d)(1) or (d)(2).  Other than *Batson*, petitioner has identified no clearly established Supreme Court law related to this specific claim.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-part test for determining whether counsel's representation was so deficient as to violate the defendant's right to counsel guaranteed by the Sixth Amendment.  First, "petitioner must show that counsel's representation fell below an objective standard of reasonableness."  Second, "petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Chandler v. United States*, 218 F.3d 1305, 1312-13  (11th Cir. 2000) (en banc) (internal quotations and citations omitted).

Evaluation of the first prong of an ineffective assistance claim, the reasonableness of counsel's performance, is guided by the principles set forth by the Eleventh Circuit in *Chandler*. First, the standard is *reasonableness* under the prevailing norms of the legal profession.  *Id.* at 1313.  The question is not whether counsel did what was possible, or even what was prudent but whether he did what was "constitutionally compelled."  *Id*.  The burden of persuasion is on the petitioner to prove by a preponderance of competent evidence that counsel's performance was unreasonable.  *Id.*  Review of counsel's performance must be highly deferential, and there is a "strong presumption" of reasonableness.  *Id.* at 1314.  That presumption is even stronger if petitioner was represented by experienced trial counsel.  *Id.* at 1315.  Nothing looks the same in hindsight; therefore, the Court must evaluate the reasonableness of counsel's performance from counsel's perspective at trial.  *Id.* at 1316.  No absolute rules dictate what is reasonable.  *Id.* at 1317.  Hence, counsel has no absolute duty to investigate particular facts or a certain line of defense.  *Id.*

Even when an attorney is shown to have performed unreasonably in his representation of a defendant, it is just as likely as not that his error was harmless.  *Johnson v. Alabama*, 256 F.3d

34

1156, 1177 (11th Cir. 2001).  Therefore, a petitioner has a difficult burden to prove the prejudice

prong of his ineffective assistance of counsel claims.  *Id.*  As noted, prejudice requires proof that

"'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.'" *Id.* (quoting *Strickland v. Washington,* 466 U.S. at 694).

A "reasonable probability is a probability sufficient to undermine confidence in the outcome of

the proceedings.'" *Id.*  It is not enough to show that the error had "some conceivable effect;"

rather, the error must be so egregious as to render the trial unfair and the verdict suspect.  *Id.*

With the passage of AEDPA, Congress further restricted federal review of a state

petitioner's ineffective assistance of counsel claims.  When an ineffective assistance of counsel

claim is raised in a § 2254 proceeding, "another layer of deference [is added]–this one to the

state court's decision. [Petitioner] must do more than satisfy the *Strickland* standard.  He must

also show that in rejecting his ineffective assistance of counsel claim the state court 'applied

*Strickland* to the facts of his case in an objectively unreasonable manner.'" *Rutherford v. Crosby*,

385 F.3d 1300, 1309 (11th Cir. 2004) (quoting *Bell v. Cone*, 535 U.S. 685, 689 (2002)).

As discussed previously, AEDPA permits a federal court to overturn a state court

conviction or sentence on habeas review only if (1) the state court's factual determination was

unreasonable (2) its decision was contrary to clearly established law, or (3) its application of the

law was unreasonable.  Generally, where a state court applies the *Strickland* standard to an

ineffective assistance of counsel claim, its decision cannot be found to be contrary to clearly

established federal law.  *See, e.g., Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002

(state court correctly identified *Strickland* standard and, therefore, applied controlling legal

principles as required by AEDPA); *Putnam v. Head*, 268 F.3d 1223, 1242 (11th Cir. 2001)

(same).   Thus, to succeed on an ineffective assistance of counsel claim, a petitioner normally must show either that the state court unreasonably applied *Strickland* to the facts it found *or* that the state court's findings of fact were themselves unreasonable.  In addressing his ineffective assistance claims, petitioner often ignores these requirements.  In some instances he relies on facts different from, or contrary to, those found by the state court (without demonstrating the factual determination to be unreasonable).  In others, he argues the merits of his ineffective assistance of counsel claim but does not attempt to demonstrate how or why the state court unreasonably applied *Strickland*.  Each of petitioner's ineffective assistance of counsel claims is discussed below.

### Claim C(a):  Counsel's Failure to Investigate and Present Evidence Supporting the Motion to Suppress Statements

Petitioner's mother, Arcola Williams, testified at the Rule 32 hearing that Agent Barnett had, in effect, induced Mrs. Williams and her husband to persuade petitioner to give a third statement after petitioner had invoked his right to counsel.  This evidence was not presented at the suppression hearing.  In his Rule 32 petition, petitioner argued that his attorneys rendered constitutionally ineffective assistance because they failed to discover Mrs. Williams testimony about the conversation with Barnett and present it at the suppression hearing.[17]  The state court found insufficient evidence to satisfy either *Strickland* prong. As to the reasonableness of counsel's actions, no evidence was presented that counsel did not attempt to discover information of this type or that counsel knew about the evidence and failed to present it at the

---

[17]Petitioner asserts that the evidence proves an *Edwards* violation and would have led to the suppression of his third statement and any evidence resulting from it.

suppression hearing.  *Williams*, 782 So. 2d at 832.  Hence, the state court concluded that

counsel's conduct did not fall outside the range of reasonableness expected of competent

counsel.  With respect to *Strickland's* prejudice prong, the state court found that petitioner was

not prejudiced because "there [wa]s no reasonable probability that, if trial counsel had presented

Mrs. Williams' testimony, the result of the decision on the motion to suppress... would have been

different."  *Id.* at 833.  Specifically, the court found "[in]sufficient evidence to indicate that there

was any State action before petitioner reinitiated contact with police."  *Id.*  In other words, the

state court did not believe Mrs. Williams' version of events.

Petitioner argues that his attorneys' alleged failure to investigate satisfies the first

*Strickland* prong and that the state court's decision to the contrary "contravenes clearly

established federal law."  (Petr's Brf. at 88.)  The state court's decision is not contrary to clearly

established federal law because it neither "contradicts the governing law set forth in [the

Supreme Court's] cases" nor "arrives at a result different from" Supreme Court precedent

involving materially identical facts.  *Williams v.  Taylor,* 629 U.S. 362, 405-06 (2000).  First, the

state court followed  *Strickland*–the Supreme Court's standard for deciding ineffective assistance

of counsel claims.  Second, neither of the Supreme Court cases cited by petitioner involved

similar, much less identical, facts.  In both *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins

v. Smith*, 539 U.S. 510 (2003), trial counsel failed to uncover *existing* exculpatory evidence.

Here, the Rule 32 court rejected the factual basis for petitioner's claim; therefore, there was no

exculpatory evidence for counsel to find.

To the extent that petitioner's argument could be interpreted as a claim that the state

court unreasonably applied *Strickland*'s first prong, it would also fail.  Petitioner's argument

relies on facts discounted by the state court.  Specifically the court found that "no evidence ha[d] been presented that trial counsel did not investigate for this type of evidence, or that any of this information was communicated to trial counsel."  *Williams*, 782 So. 2d at 831.  In other words, the state court found that petitioner failed to meet his burden of proof as to the alleged lack of investigation.

Petitioner does not address the state court's holding regarding the second *Strickland* prong but, instead, attempts to argue the prejudice issue anew.[18]  The state court found petitioner was not prejudiced by counsel's failure to present the evidence at the suppression hearing because there was insufficient evidence to indicate that there was any state action before Williams reinitiated contact with police.[19]  Petitioner has made no attempt to demonstrate that this factual finding was unreasonable.  Since the court found that petitioner's statement was not initiated by state action, there was no legal basis for suppressing the statement and the state court correctly concluded that no prejudice had resulted from counsel's failure to discover and present the evidence.

### Claim C(b): Counsel's Failure to Engage in Effective Voir Dire with Venire Members Who Opposed Death Penalty

---

[18]As discussed above, this Court must defer to the state court's application of *Strickland*. Again, the question to be decided on federal review under § 2254(d) is not whether counsel was ineffective under *Strickland* but whether the state court unreasonably applied *Strickland* to the facts of this case.

[19]The state court did not explain the precise factual basis of its finding of the lack of state action.  It could be that the court found a lack of evidence that Mrs. Williams communicated Barnett's statements to the petitioner; hence, the state action did not induce petitioner's statement.  It could also be that the court disbelieved Mrs. Williams' version of events and found that Barnett never made the statement at all.

Petitioner argues that counsel failed to engage in thorough and effective voir dire of jurors who expressed opposition to the death penalty.  As to this issue, the state appellate court ruled that "contrary to the appellant's assertion, the record of his trial shows that his attorneys did indeed question and attempt to rehabilitate each of the four veniremembers to whom the appellant refers in his brief.  However, the trial court properly excused those veniremembers for cause because each stated that he or she would not vote to impose the death sentence under any circumstances."  *Williams*, 782 So. 2d at 833.  In his brief before this Court, petitioner, again, argues the merits of ineffective assistance of counsel claim without attempting to demonstrate why the state court's decision in this regard was an unreasonable application of clearly established federal law.  Moreover, petitioner's argument relies heavily on a conclusory assertion, *i.e.*, that counsel did not "adequately" question the four jurors who were excused.[20] The state court found otherwise, and petitioner has failed to explain, much less persuade this Court, why the state court's legal or factual determinations were unreasonable.[21]

### Claim C(c): Counsel Failed to Assert Challenge for Cause Against Biased Venire Members

---

[20]Indeed, after reviewing the record and the questions posed by defense counsel, it is difficult to conceive what petitioner would consider adequate.  *See* R. Vol. III, 149-52, 158-59, 165-69.  Petitioner's standard would certainly be higher than the wide range of reasonableness set by *Strickland*.

[21]Petitioner's brief also confuses the facts regarding voir dire. Petitioner acknowledges in his factual summary that defense counsel did pursue voir dire as to the four veniremembers who expressed opposition to the death penalty.  However, his legal argument asserts different, nonexistent facts.  Specifically, petitioner contends that counsel's performance was deficient because trial counsel made no efforts whatsoever at their rehabilitation and lodged no objection to their being excused for cause.  Both of these allegations, *i.e.*, no efforts to rehabilitation and no objection to the excuse for cause, are contrary to the record.  *See* R. Vol. III, 149-52, 158-59, 165-69.

Petitioner also alleges that counsel was ineffective at jury selection because they failed to engage in thorough and effective voir dire of jurors who demonstrated bias towards the prosecutor's version of the facts, specifically, the prosecution's theory that petitioner had murdered the victim in order to steal his car.[22]   The state appellate court rejected this claim, stating:  "[A]gain contrary to the appellant's assertion, the record of the appellant's trial shows that his attorneys did indeed question each of the four veniremembers about any potential they may have had in favor of the prosecution or against him.  Upon further questioning, each veniremember stated that she could set aside what she had heard abut the case and decide the case based solely on the evidence presented from the witness stand."   As with the previous claim, petitioner presents this claim as though there were no state court decision to review and fails to demonstrate why the state court's legal or factual determinations are unreasonable.

### Claim C(d):  Trial Counsel's Failure to Object to Prosecutor's Comments

Petitioner argues that trial counsel rendered constitutionally ineffective assistance because they failed to object to several allegedly improper comments by the prosecutor.  The amended petition sets forth four objectionable comments:  (1) that the defendant was a "predator" (2) that the defendant had more rights than the victim; (3) that the victim had no black friends; and (4) that defendant's multiple statements indicated guilt.[23]  Petitioner contends that all

---

[22]In response to questioning, four veniremembers stated that, based on what they learned from media coverage of the case, they believed the victim's car had been stolen.

[23]In his brief, petitioner presents a third improper argument/ineffective assistance claim based the prosecutor's reference to God, the Bible and religion.  This claim was not asserted in the amended petition, and petitioner has neither sought nor been granted leave to amend.  For that reason, this ineffective assistance claim is denied.

of these statements were inflammatory and without evidentiary foundation.  In addition, petitioner contends that the fourth comment impermissibly shifted the burden of proof to the defendant.  In his merits brief, petitioner states the third comment differently, that is, that the prosecutor stated that the *defendant* had no *white* friends. Petitioner raised these claims in his Rule 32 petition and in his Rule 32 appeal.  The state court ruled that none of the comments were improper and that no prejudice had resulted.  *Williams*, 782 So. 2d at 835-36.  That decision was not unreasonable because the comments did not violate petitioner's due process rights.

Even though petitioner's claim is directed at  counsel's failure to object to the prosecutor's comments, rather than the comments themselves, the starting point for analyzing the ineffective assistance claim is whether the comments violated petitioner's right to due process. *See United States  v. Miles* 53 Fed. Appx. 622, 630 (3d Cir. 2002); *United States  v. Lively,* 817 F. Supp. 453, 464 (D. Del.1993) "[A] meritorious due process claim based on the [prosecution's] improper summation is a necessary component of a successful Sixth Amendment claim based on defense counsel's failure to object to the summation."  *Lively*, at 464.  A prosecutor's remarks do not result in the denial of due process unless those remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court held that the prosecutor's closing argument, though "deserv[ing] [of] the condemnation it has received from every court to review it," did not violate the narrow due process standard applicable on habeas review.  *Id.* at 180. Several factors influenced the court's conclusion.  First, "the prosecutors' argument did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  *Id.*

41

at 181-82.  Moreover, "[m]uch of the objectionable comment was invited by or was responsive to the opening summation of the defense."  *Id.* at 182. In addition, the jury was instructed that counsel's argument was not evidence and that their decision was to be based on the evidence. Finally, because the evidence against the defendant was substantial, the likely impact of the prosecution's argument was reduced.

Applying the due process standard to the prosecutor's remarks in this case, it is clear that no violation occurred.  The prosecutor's description of petitioner as a predator was a fair characterization of the evidence and was intended to counter defense counsel's argument that the defendant and the victim knew each other.  The prosecutor argued that some  personal facts the defendant knew about the victim were likely learned as the defendant, who meticulously planned the crime, surprised his victim and forced him from his home at gunpoint.  That the defendant had more rights than the victim was not a misstatement or a manipulation of the evidence and was invited response to defense counsel's argument that the police badgered the defendant into giving statements. Petitioner argues forcefully that the prosecutor's argument that the defendant had no white friends is without evidentiary support, a factor that would weigh in favor of finding due process violation.  The record does, however, support the prosecutor's argument.[24]

---

[24]The confusion arises from the fact that the prosecutor attributed the testimony to the wrong witness.  The prosecutor argued that Darrell Powell, a friend of the defendant, testified that the defendant had no white friends.  In the Rule 32 appeal, the Alabama Court of Criminal Appeals cited Powell's testimony as evidentiary support for the prosecutor's argument. *Williams*, 782 So. 2d at 836.  In fact, Powell was asked only whether the defendant had a white friend named Tim Hasser.  Another prosecution witness, Israel Kennedy, was asked whether the defendant "ever mention[ed] that he had any white friends?"  Kennedy replied, "No, I never seen him with anyone."  (R. Vol. IV, 131.)  Thus, despite the incorrect citation, the state court's factual finding is not unreasonable.

Petitioner contends that the presumption of innocence was undermined by the prosecution's argument that the defendant's four exculpatory statements should be considered as of his guilt. The argument was based on a logical inference from the evidence[25] and "undermined" the presumption of innocence only to the extent that it properly pointed out evidence from which the jury could find the presumption had been overcome.  To the extent that any of the prosecutor's comments might be considered improper, the negative effect would have been ameliorated by the trial court's instructions[26] and by the overwhelming evidence of the defendant's guilt.

In sum, the prosecutor's closing arguments did not violate defendant's due process rights. Consequently, trial counsel's failure to object to those arguments was neither objectively unreasonable nor prejudicial to the petitioner. The state Court's decision as to this claim was neither contrary to nor an unreasonable application of clearly established law.

**Claim C(e):  Trial Counsel's Failure to Object to Jury Instructions**

Petitioner asserts that trial counsel rendered constitutionally ineffective counsel because they failed to object to guilt-phase jury instructions on reasonable doubt and the voluntariness of defendant's statements.  With respect to the reasonable doubt instruction, petitioner argues that

---

[25]One might reasonably conclude that only someone who was guilty would have given such inconsistent, contradictory and implausible statements.

[26]With respect to counsel's closing arguments, Judge McRae instructed the jury that the attorneys "have a right to draw inferences and conclusions from the facts as they remember those facts to be.  But also on day one, I told you that you would be the sole tryers of the facts in this case.  And if any attorney has argued to you facts, inferences, or conclusions from those facts, different from what you yourself would draw, then I tell you to totally disregard it because again, you're the sole tryers of the facts in this case."  (Vol VII at 88-89.)  Judge McRae further instructed that the verdict "must be based upon the evidence and just and reasonable inferences from that evidence.  Furthermore, you must not permit sympathy, prejudice, or emotion to influence you in any way." (R. Vol VII 107.)

counsel should have objected to instructions that required the jury to "justify an acquittal ...[by] an actual and substantial doubt and not merely a possible doubt."  According to petitioner, the trial court's instruction was improper and prejudicial based on the Supreme Court's decision in *Cage v. Louisiana*, 498 U.S. 39 (1990).  The Rule 32 court rejected this ineffective assistance of counsel claim because the underlying substantive claim–the validity of the reasonable doubt instruction in light of *Cage*–was raised by the defendant on direct appeal and decided in the state's favor.  *Williams*, 782 So. 2d at 837.  The state court did not unreasonably apply clearly established ineffective assistance of counsel law because failure to raise a nonmeritorious objection does not amount to ineffective assistance.  *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11ᵗʰ Cir. 1994) ("axiomatic that failure to raise non-meritorious issues does not constitute ineffective assistance").

As to counsel's failure to object to the voluntariness instruction, the Rule 32 court held that trial counsel's actions were neither unreasonable nor prejudicial because the instructions were not improper.  Petitioner argues here, as he did before the Rule 32 court, that the instructions were improper because they informed the jury that the judge had determined the confession to be voluntary and suggested that the jury should give great weight to the defendant's statements.  The state court found, not unreasonably, to the contrary.  Petitioner relies on *Ex Parte Singleton*, 465 So. 2d 443 (Ala. 1985), in support of the proposition that "[i]t is improper for a trial judge to disclose to the jury that he made a preliminary determination that a confession was voluntary and, therefore, admissible."  *Id.* at 446.  But, in *Singleton* the trial court's instruction was found *not* to be prejudicial even though the judge told the jury that he had made a preliminary decision on voluntariness and had admitted the statement into evidence.  No

prejudice ensued because the trial judge followed that statement with a clear instruction that the jury, not the judge, was the trier of fact and that the burden was on the state to prove that the statement was voluntary. *Id.* The trial judge in this case explained to the jury that "the burden is first upon the court to determine [questions related to voluntariness] for the purpose of admitting the statement or refusing its admission into evidence." (R. Vol. VII ,104-05.) However, just as in *Singleton*, he immediately followed that statement with a clear instruction that the jury was to determine the question of voluntariness.[27]

### Claims C(f), (g) & (h):  Failure to Investigate and Present Mitigation Evidence

Petitioner claims that trial counsel were constitutionally ineffective at sentencing because they failed to investigate and present two types of additional mitigation evidence. First, petitioner alleges that counsel failed to present an adequate picture of the childhood abuse, violence and trauma he suffered at the hands of his father and, to a lesser extent, his mother. The only defense witness at the sentencing hearing was petitioner's mother, who testified at the hearing about childhood abuse inflicted upon petitioner by his father. At the Rule 32 hearing, petitioner presented evidence from three additional witnesses--his uncle, his aunt and his half-sister–which painted a more detailed picture of the horrific abuse inflicted by his alcoholic father on all members of the family, including the petitioner. Each of these witnesses testified that he or she would have testified at the sentencing phase but that defense counsel never contacted them. The second type of mitigation evidence presented at the Rule 32 hearing was the expert

---

[27]"In this connection, the burden is on the State to satisfy you, the jury, beyond a reasonable doubt that the confession or statement against interest of the Defendant was a voluntary statement and was given by him without fear of punishment or hope of reward ..." (R. Vol. VII, 104-05.)

testimony of Dr. Gelwan, who diagnosed the petitioner as suffering from Post-Traumatic Stress

Disorder (PTSD) resulting from childhood trauma and abuse.

Judge McRae, the sentencing judge, presided over the Rule 32 hearing.  After hearing the

additional mitigation evidence, Judge McRae concluded that counsel's investigation and

presentation of mitigation evidence was not unreasonable and that no prejudice had resulted

from the omission of the mitigation evidence at sentencing.  Judge McRae found that counsel did

investigate and present evidence of abuse and that counsel's investigation and presentation of

mitigation evidence was not objectively unreasonable because the omission of this evidence at

sentencing was not prejudicial since there was no "causal relationship" between the abuse and

the murder.  He further elaborated that "any additional testimony. . . that [petitioner] was

physically abused by his father has little mitigation value due to the fact that this was a

deliberately planned crime where the victim was murdered because [petitioner] wanted his car."

*Williams*, 782 So. 2d at 827.  Similarly, Judge McRae found no prejudice from the failure to

present the testimony of Dr. Gelwan at the sentencing hearing because it "would not have

resulted in . . . a sentence other than death.  There is no reasonable probability that the sentencer

would have concluded that the balance of aggravating and mitigating circumstances did not

warrant a death sentence."   The Alabama Court of Criminal Appeals adopted Judge McRae's

opinion on these issues.

Petitioner argues that the state court made "three errors of law"in its decision denying

relief based on counsel's failure to investigate and present the additional mitigating evidence set

forth above.  First was the "their failure to conclude that trial counsel's investigation was

insufficient under *Strickland*."  (Pet.'s Merits Brf. at 150.)  Second was the conclusion that

petitioner was not prejudiced by counsel's failure to present additional mitigating evidence. Third, petitioner alleges that the state courts erroneously required that the petitioner show a "nexus" between the mitigating evidence and the murder.[28]  As with many of his prior claims, petitioner cites Supreme Court law but does not explicitly rely on either the "contrary to" or the "unreasonable application" prong of § 2254(d)(2).  Petitioner contends that the state court was wrong and apparently leaves it to this Court to figure out how those allegedly wrong decisions meet § 2254's standard of review.

Layering the standard of review set by § 2254(d)(2) on top of the *Strickland* standard for reasonably competent counsel as defined by the Eleventh Circuit in *Chandler*, the first question presented is whether the state court reasonably concluded that the petitioner failed to overcome the strong presumption that counsel's actions--in this case their mitigation investigation which failed to yield additional abuse evidence or expert psychological testimony--was reasonable. *Chandler* at 1314-15.  The presumption of reasonableness is overcome only if counsel was "constitutionally compelled" to investigate further.  *Id.*  Judge McRae held that the counsel's investigation–both with respect to abuse evidence and expert testimony--was adequate.  In other words, petitioner's evidence did not overcome the presumption of reasonableness.  In this case, unlike the cases cited by petitioner, the record is virtually silent as to counsel's sentencing phase investigation.   Evidence at the Rule 32 hearing established that: (1) the three family members who testified regarding abuse–petitioner's half-sister, aunt and uncle–would have been available to testify at the sentencing phase but were never contacted by trial counsel; (2) Mr. Lackey

---

[28]Petitioner does not specify whether this argument goes to the reasonableness prong or the prejudice prong of the *Strickland* analysis.

recalled having talked to petitioner's aunt or mother regarding penalty phase mitigation evidence;[29] (3) Mr. Wilson recalled that Mr. Lackey was in charge of the penalty phase preparation; (R. Vol. XIII, 144) and (4) Mr. Lackey did not consider calling Dr. Van Rosen to testify at sentencing because "his report indicated that there were not – that other than some borderline problems in intelligence and so on, that there was nothing basically wrong with Mr. Williams and that the testing was–was felt somewhat skewed by a lack of effort or attempts to confuse the tester by Mr. Williams." (R. Vol. XIII, 53.)   The foregoing  is the only Rule 32 evidence from which one might glean anything at all about the mitigation investigation.

Petitioner has cited three Supreme Court cases as clearly establishing the law with respect to counsel's duty to investigate.[30]  In contrast to the evidence here, each of those cases provides detailed account of counsel's shortcomings.  In *Rompilla v. Beard*, 545 U.S. 374 125 S. Ct. 2456 (2005), the Supreme Court recognized that there was "room for debate about trial counsel's obligation to follow . . . potential lines of enquiry" with respect to mitigation evidence." *Id.*, 125 S. Ct. at 2654.  But the Court did not decide that issue because "a further point [wa]s dispositive: the lawyers were deficient for failing to examine the court file on Rompilla's prior conviction." *Id.*  In *Wiggins v. Smith*, 539 U.S. 510 (2003), trial counsel chose

---

[29]Questioning of Mr. Lackey regarding the sentencing preparation was vague.  Counsel asked Lackey to "briefly [ ] tell us what you did in preparation for the sentencing phase.  Mr. Lackey responded: "I don't recall that we did anything in particular that we hadn't already done." (R. Vol. III , 54.)   After being interrupted by Judge McRae, Mr. Lackey recalled that petitioner's motion testified about "some things in his background or his childhood that we felt would be helpful or give sympathy to Mr. Williams."  (*Id.* at 54-55.)

[30]Two of those cases–*Rompilla* and *Wiggins*–cannot be relied on as precedent under § 2254(d)(1) because they were decided after the denial of petitioner's Rule 32 petition became final.  *See* discussion, *infra* p. 52.

to pursue a bifurcated sentencing that would have allowed them to argue, first, that the defendant was not directly responsible for the murder.  If that issue were decided against the defendant, then they would present mitigation evidence.  The motion to bifurcate was denied.  At sentencing counsel relied on defendant's lack of direct involvement and presented *no* mitigation evidence, other than his lack of criminal history.  The court of appeals found that counsel's decision to rely on lack of involvement, rather than mitigation, at sentencing was a strategic one and, therefore, entitled to deference.  The Supreme Court reversed, holding that the decision was made without sufficient investigation into the defendant's dysfunctional background.  The evidence presented at the state habeas hearing established that counsel's investigation "fell short of the standards that prevailed in Maryland in 1989."  *Id.* at 524.  In addition, the little background evidence counsel did uncover should have caused them to look further; instead, counsel abandoned its investigation.  *Id.* at 528.  Finally, in *Williams v. Taylor*, 529 U.S. 362 (2000), defense counsel failed to discover and present mitigation evidence of horrific childhood abuse because counsel erroneously believed that they were not entitled to obtain commitment records from which this information was discovered.  In each of those cases, what counsel did or failed to do–failing to examine a prior conviction (*Rompilla*), making a strategic decision without all the facts (*Wiggins*), failing to subpoena records due to a misunderstanding of the law (*Williams*)–is clearly set forth in the record.  In each case, the result was a lack of mitigation evidence.  Here, the record shows only the final result–the evidence that was not presented in mitigation. The record does not establish what counsel did or did not do in their investigation to reach that final result.  Consequently, it is clearly insufficient to overcome the presumption of reasonableness afforded by *Strickland* and *Chandler*.  "[W]here the record is incomplete or

unclear about [counsel]'s actions, we will presume that he did what he should have done, and that

he exercised reasonable professional judgment." *Chandler,* at 1315. [31]   Since the petitioner's

evidence did not overcome the presumption of reasonableness, the state court did not

unreasonably apply *Strickland's* reasonableness prong.

Next, petitioner challenges the state court's ruling as to *Strickland's*  prejudice prong.

Because this is a judicial override case, petitioner's position amounts to a claim that Judge

McRae unreasonably concluded that he would have imposed the same sentence even if all of the

additional Rule 32 evidence had been presented at the sentencing phase.  Of course, petitioner

does not state his argument in these terms, and he has cited no clearly established law that would

support such an anomalous argument.  Instead, he presents an argument that is a complete non

sequitur–that "[c]ounsel's failure to present thorough, coherent mitigation evidence at Mr.

Williams' trial is particularly egregious in light of Judge McRae's well-known history of

overriding juries' recommended sentences of life without parole."  Petitioner points out cases in

which Judge McRae had exercised his power of judicial override to sentence a defendant to

death despite the jury's recommendation of life imprisonment.   But Judge McRae's history of

judicial overrides has no relevance to whether he would have reached the same result if

additional evidence had been presented.  In fact, the additional evidence *was* presented at the

Rule 32 hearing, and Judge McRae *did* reach the same result.

Petitioner's final ineffective assistance/mitigation argument is also presumably directed

at the state court's holding as to *Strickland's* prejudice prong.  Relying on *Tennard v. Dretke*,

---

[31]It is unclear how, or if, petitioner's claim that counsel failed to *present* mitigation
evidence is separate from the failure to investigate

petitioner contends that Judge McRae and the Court of Criminal Appeals "use[d] an erroneous legal standard for judging the copious mitigation evidence presented at the Rule 32 hearing." (Petr.'s Merits Brf., Doc. 45 at 171.)  Specifically, Judge McRae noted that there was no "causal relationship" between the Rule 32 evidence of abuse and neglect and Williams' crime.  *Williams*, 782 So. 2d at 826.  According to petitioner, Judge McRae's "causal relationship" language was tantamount to imposing a "nexus" requirement between the mitigating evidence and the crime–a requirement that petitioner's asserts was rejected by the Supreme Court in *Tennard*.

Reliance on *Tennard* is misplaced for several reasons.  First, *Tennard* was decided *after* the state courts concluded review of petitioner's Rule 32 petition.  "[C]learly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions *as of the time of the relevant state court decision*."  *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (emphasis added).  Second, no law was "clearly established" in *Tennard* because that case addressed the Fifth Circuit's decision to deny a certificate of appealability.  The Supreme Court concluded only that the issue presented was debatable among jurists of reason and, therefore, that a certificate of appealability should have been granted.  *Tennard*, 542 U.S. at 289.  But the *Tennard* court was not called upon to, nor did it, decide the underlying issue.

Finally, the state court's decision–that petitioner was not prejudiced by the failure to present additional mitigation evidence--is not an unreasonable application of, nor is it contrary to, the proposition for which *Tennard* is cited.  The underlying substantive issue in *Tennard* was whether the jury instructions allowed the jury to give appropriate consideration to the mitigating evidence.  The Fifth Circuit concluded that the evidence relied upon by the defendant–evidence of his low IQ--was not relevant to mitigation because the defendant had failed to show that his

51

crime was attributable to his low IQ.  Read in context, Judge McRae's observation about the lack

of "causal relationship" goes to his assessment of the weight of the petitioner's additional abuse

and neglect evidence, not to its relevance or to his ability to consider it at sentencing.

> In addition the evidence regarding Williams' background was never found to have
> a causal relationship with Williams committing capital murder.  In the sentencing
> order, this court found that Williams "purposely and deliberately planned to enter
> the home of the victim, Timothy C. Hasser, await his arrival, and steal his
> automobile, a model 928 Porsche." . . .  This court further stated in the sentencing
> order that the events which led to the murder of Timothy Hasser were not the
> product of chance; rather, these events were not planned and executed with
> military-like precision." . . .  At trial, there was evidence presented that Williams
> was obsessed with the automobile owned by Timothy Hasser.  Williams carried
> out his plan to take Hasser's Porsche by abducting the victim at gunpoint and
> killing him at a remote site and attempting to dispose of the body by throwing it
> into a river.  *Any additional testimony offered by Williams at the Rule 32*
> *evidentiary hearing that he was physically abused by his father has little*
> *mitigation value due to the fact that this was a deliberately planned crime where*
> *the victim was murdered because Williams wanted his car.*"

*Williams*, 782 So. 2d at 827 (emphasis added).  In summary, Judge McRae did not unreasonably

refuse to consider petitioner's mitigation evidence, nor was his analysis of that evidence contrary

to clearly established law.

### New Claim: Ineffective Assistance on Direct Appeal

In his merits brief, petitioner raises an claim for ineffective assistance of *appellate*

counsel.  This claim was not identified or addressed in the petition, in the amended petition or at

any point in the procedural default stage.  It is an entirely new claim.  The appropriate method

for asserting a new claim at this stage of the proceedings is by filing a motion for leave to

amend.  *See In re Hill*, 113 F.3d 181 (11th Cir. 1997) (Fed. R. Civ. P. 15(a) provides procedure

for amending petition); Fed. R. Civ. P. 15(a) (after responsive pleading has been filed party may

amend only with leave of court).  Since leave to amend has not been sought or given, this ground

cannot provide a basis for habeas relief.

## Claim D: Brady Claim/Barnett Statement

This claim requires little discussion because it is based on evidence rejected by the trial

court.[32]  Petitioner contends that the prosecution failed to disclose to the defense that Agent

Barnett had enlisted the help of Mr. and Mrs. Williams to obtain a statement from the petitioner.

This is contrary to the state court's factual finding that the statement was *not* induced by state

action, and petitioner has failed to demonstrate why the findings on this issue are unreasonable in

light of the evidence presented at the Rule 32 hearing.[33]

## Claim F: Denial of Youthful Offender Status

Petitioner contends that he was denied his constitutional right to due process of law under

the Eighth and Fourteenth Amendments because the trial court failed to conduct a sufficient

investigation and examination before denying his request for youthful offender status.  This

claim was raised on petition for certiorari to the Alabama Supreme Court.  By affirming the

conviction, that court implicitly rejected the youthful offender claim although the claim itself

was not specifically addressed.  Even this "unexplicated rejection of [petitioner's] federal claim

qualifies as an adjudication entitled to deference under § 2254(d)."  *Herring v. Secretary Dept. of*

---

[32]Interestingly, this claim was not raised in the Rule 32 petition, nor was it addressed by the Rule 32 court.  However, it was raised in the Rule 32 appeal, and the Alabama Court of Criminal Appeals addressed, and rejected, the claim because there was insufficient evidence to support it.  *Williams*, 782 So. 2d at 832.  The facts underlying the claim are also the basis for one of petitioner's ineffective assistance of counsel claims.

[33]The Rule 32 court's rejection of the underlying facts is discussed  *infra*, pp. 37-39.

*Corrections*, 397 F.3d 1338, 1347 (11th Cir. 2005).

The state court's denial of the youthful offender/due process claim was not an unreasonable application of clearly established law.  Petitioner cites *Hicks v. Oklahoma*, 447 U.S. 343 (1980), for the proposition that "the arbitrary denial of an important state-created right violate[s] due process."  (Petr.'s Merits Brf., Doc. 45, at 192.)   In this case, however, the state-created "rights" allegedly denied never existed in the first place.  "The granting or denial of youthful offender treatment is analogous to that of sentencing where courts have wide discretion even though there are few or no statutory guidelines for the exercise of such discretion. Once it is determined that the judge has exercised his discretion within statutory limits, appellate review is at an end." *United States ex rel. Frasier v. Casscles*, 531 F.2d 645, 647 (2nd Cir. 1976) (per curiam).  Like the New York statute in *Casscles*, the Alabama Youthful Offender Act commits the decision on youthful offender status to the complete discretion of the trial judge.  Ala. Code § 15-19-1 (1975).[34]  The statute provides that the defendant "may be investigated and examined by

---

[34]In its entirety, § 15-19-1 states:

(a) A person charged with a crime which was committed in his minority but was not disposed of in juvenile court and which involves moral turpitude or is subject to a sentence of commitment for one year or more shall, and, if charged with a lesser crime may be investigated and examined by the court to determine whether he should be tried as a youthful offender, provided he consents to such examination and to trial without a jury where trial by jury would otherwise be available to him. If the defendant consents and the court so decides, no further action shall be taken on the indictment or information unless otherwise ordered by the court as provided in subsection (b) of this section.

(b) After such investigation and examination, the court, in its discretion, may direct that the defendant be arraigned as a youthful offender, and no further action shall be taken on the indictment or information; or the court may decide that the defendant shall not be arraigned as a youthful offender, whereupon the indictment or information shall be deemed filed.

the court to determine whether he should be tried as a youthful offender" but contains no requirement for any specific type of investigation or examination, nor does it require that the defendant be afforded an opportunity to present evidence or to challenge the investigation.  *Id.*

## CONCLUSION

Petitioner is not entitled to relief on any of the claims that have proceeded to review on the merits.  Because all of the claims presented in this matter have been found to be either moot, procedurally defaulted or without merit, it is hereby **ORDERED** that the petition for habeas relief be and hereby is **DENIED**.

**DONE** and **ORDERED** this the 30th day of October, 2006.


*s/ Charles R. Butler, Jr.*

**SENIOR UNITED STATES DISTRICT JUDGE**